## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO.** |
| | ) | |
| **v.** | ) | |
| | ) | **VIOLATION:** |
| **PATRICK STRAUSS,** | ) | |
| | ) | **Count 1: 18 U.S.C. § 1349** |
| **Defendant** | ) | **(Conspiracy to Commit Bank Fraud)** |

## INFORMATION

The United States Attorney for the District of Columbia charges that:

### Background

At all times relevant to this Information, on or about the dates and times stated herein:

### *The Co-Conspirators*

1.      Defendant **Patrick Strauss** was a resident of the District of Columbia and the owner and operator of Powergrid Real Estate LLC.

2.      Kelly Winston was a resident of Maryland and employed as an accountant for several businesses under the control of Individual 1 that operated in the District of Columbia.

3.      Individual 1 was a resident of Maryland and operated several businesses in the District of Columbia that provide services to the District.

### *Relevant Entities*

4.      Powergrid Real Estate LLC ("Powergrid"), was a real estate business registered as a corporation in Delaware on May 23, 2017, and operated in the District of Columbia.

5.      Capital Bank, N.A. ("Capital Bank") is a financial institution insured by the Federal Deposit Insurance Corporation.

### *The Small Business Administration*

6.      The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

### *The Paycheck Protection Program*

7.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of billions in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

8.      In order to obtain a PPP loan, a qualifying business must have submitted a PPP loan application, which is signed by an authorized representative of the business.  The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the applicant must state, among other things, its: (a) average monthly payroll expenses and (b) number of employees.  These figures were used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must have provided documentation showing their payroll expenses.  To qualify for eligibility, businesses that applied for a PPP loan needed to be in operation as of February 15, 2020.

9.      A PPP loan application must have been processed by a participating financial institution (the lender).  If a PPP loan application was approved, the participating financial

institution funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

10.     PPP loan proceeds must have been used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time and uses a certain percentage of the PPP loan proceeds on payroll expenses.

11.     On December 27, 2020, the Economic Aid to Hard-Hit Small Business, Nonprofits and Venues Act provided additional funding for the PPP and extended the application deadline to March 31, 2021. The act enables borrowers to take a second draw PPP loan under the same general terms as their first PPP loan up to a maximum loan amount of $2 million. The act reopened the program to borrowers who did not previously receive a first draw PPP loan. To be eligible for a second draw, borrowers must employ no more than 300 employees, demonstrate a 25% reduction in gross receipts during a calendar quarter in 2020, and have expended the full amount of their initial PPP loan. Allowable expenses were expanded to include worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations. The expansion applies retroactively to first draw PPP loans that have not been forgiven by the SBA.

12.     On March 25, 2021, the PPP Extension Act of 2021 extended the application deadline from March 31, 2021, to May 31, 2021. In addition to extending the PPP application filing window by 60 days, the Extension Act provided an extra 30 days for the SBA to finish processing applications received by the May 31, 2021, deadline.

### COUNT 1
### (18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud)

13.     Paragraphs 1 through 12 are hereby realleged.

14.     Between on or about July 10, 2020, and on or about July 23, 2021, in the District of Columbia and elsewhere, the defendant,

**PATRICK STRAUSS**

and others, known and unknown to the grand jury, did knowingly conspire, combine, confederate, and agree to commit bank fraud, by executing and attempting to execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of a federally insured financial institution, by means of false and fraudulent pretenses, representations, and promises.

### Purpose of the Conspiracy

15.     It was the purpose of the conspiracy for **Strauss,** Winston, Individual 1 and other co-conspirators to enrich themselves, and each other, by obtaining PPP loans under false and fraudulent pretenses, and to spend the fraudulently obtained money, in part, for their own benefit and enjoyment.

### Manner and Means of the Scheme to Defraud

16.     It was part of the scheme to defraud that:

17.     Individual 1 contacted business owners within the District of Columbia, Maryland and Virginia, including **Strauss,** to inquire about their interest in applying for a PPP loan for which Winston would prepare the loan application – irrespective of the business's eligibility and without collecting from the business owners the supporting documents or information, such as accurate payroll data, necessary to support their applications.

4

18.      Individual 1 directed Winston to prepare PPP loan applications for the business so identified, which Winston did for, among others, Powergrid.

19.      As Individual 1 was aware, Winston intentionally prepared the PPP loan applications to seek amounts higher than the loan amounts for which the businesses might have qualified.  To do so, Winston included false and misleading information in the applications.

20.      Winston prepared phony federal tax forms and payroll records to support the fraudulent PPP loan applications.

21.      Winston and Individual 1 provided the fraudulent applications and supporting documents to businesses owners, including **Strauss**, who each submitted the fraudulent applications and supporting documents to a financial institution supporting the PPP loan program. As a result, the financial institutions approved and disbursed the requested PPP loans.

22.      After fraudulently obtaining the PPP loans, the business owners, including **Strauss**, kicked back a percentage of the loan proceeds to Individual 1, who in-turn split the money with Winston.

23.      Individual 1 used the loan proceeds kicked back to him for his own personal enrichment.

24.      Winston, acting at Individual 1's direction, also prepared PPP loan forgiveness applications for the businesses for which she had prepared the fraudulent PPP loan applications.

25.      Winston provided the PPP loan forgiveness applications to the business owners, including **Strauss**, who submitted them to the applicable financial institution to seek and obtain loan forgiveness.

**Execution of the Conspiracy with Regard to Powergrid**

26.      In the summer of 2020, Individual 1 approached **Strauss** to ask if he wanted to apply, with Individual 1's assistance, for a PPP loan in the name of Powergrid.  At the time, both

Individual 1 and **Strauss** were aware that Powergrid did not qualify for a PPP loan because it did not have any employees or payroll.

27.      Individual 1 and **Strauss** agreed that Individual 1 would receive a portion of the PPP funds if the loan application was approved and funded.

28.      In July 2020, Individual 1 provided **Strauss** with a PPP loan application containing materially false statements, including that Powergrid had 16 employees and an average monthly payroll of $132,547.17, when in fact, as of July 2020, it had no employees and no payroll.  In addition, Individual 1 provided **Strauss** false and fraudulent supporting documents to submit with his loan application, including: false financial statements for 2019 and for the first two quarters of 2020, false monthly payroll reports for May 2019 through March 2020,  and false Employer's Quarterly Federal Tax Return (Forms 941), for the second, third, and fourth quarters of 2019 and first quarter of 2020.

29.      **Strauss** understood that the application and supporting documentation given to him by Individual 1 had been prepared by Winston, even though neither Individual 1, nor Winston, requested, or received any information from **Strauss** that would be necessary to submit a complete and accurate PPP loan application had Powergrid been eligible for a loan.

30.      Individual 1 and **Strauss** agreed that **Strauss** would submit the PPP loan application to Capital Bank to seek a loan in the amount of $331,367.92.

31.      On or about July 10, 2020, **Strauss** submitted the PPP Loan application given to him by Individual 1 to Capital Bank to obtain a $331,367.92 PPP loan in the name of Powergrid. In addition, **Strauss** submitted to Capital Bank, with his application, supporting documents he knew to contain false information.

32.     On or about July 22, 2020, as a result of a system failure by Capital Bank, **Strauss,** through Winston and Individual 1, resubmitted Powergrid's false and fraudulent PPP loan application.

33.     On July 22, 2020, Capital Bank, based on the representations of **Strauss**, adjusted the loan amount to $304,933.

34.     On July 22, 2020, the SBA and Capital Bank approved Strauss's fraudulent PPP loan application and funded the loan in amount of $304,900.

35.     On July 23, 2020, **Strauss** opened a Capital Bank business checking account ending in -0211.

36.     On July 24, 2020, **Strauss** electronically signed various loan documents including a Promissory Note and Disbursement Request and Authorization.

37.     On July 29, 2020, the SBA and Capital Bank wired $304,900 into Powergrid's Capital Bank account ending in -3426.

38.     On July 29, 2020, **Strauss** wired $304,800 from Powergrid's Capital Bank account ending in -0211 to a TD Bank account ending in -3426, also held by Powergrid.

39.     On August 3, 2020, **Strauss** wired $124,000 from Powergrid's TD Bank account ending in -3426 to a Truist Bank account ending in -1820, held by a business associated with Individual 1.

40.     On June 4, 2021, **Strauss**  forwarded Individual 1 an email containing a link to Capital Bank's PPP loan forgiveness application for Powergrid.

41.     On June 25, 2021, **Strauss** emailed Individual 1 regarding the status of Powergrid's loan forgiveness application.  Individual 1 responded that Winston would complete and submit the application.

42.     On July 20, 2021, **Strauss** forwarded an email to Winston and Individual 1 from Capital Bank requesting "a summary paycheck or an FTE [(Full Time Equivalent)] snapshot document from ADP" for the period of January 1, 2020 through October 23, 2020.

43.     On July 20, 2021, at the direction of Individual 1, Winston prepared false and fraudulent Employer's Quarterly Federal Tax Return (Forms 941) in support of Powergrid's PPP loan forgiveness application.

44.     On July 23, 2021, **Strauss** submitted a Form 3508EZ to Capital Bank on behalf of Powergrid seeking forgiveness for his PPP loan.  The application falsely claimed that Powergrid had 16 employees at the time **Strauss** received the PPP loan, when in fact it had no employees. The application also falsely claimed that, for the period of July 27, 2020, through October 23, 2020, Powergrid spent the full amount of the second draw loan, $304,900 on payroll costs, when in fact it had no payroll costs.

45.     As a result of the false Form 3508EZ submission and supporting documentation, Capital Bank and the SBA forgave Powergrid's PPP loan.

(All in violation of Title 18, United States Code, Section 1349)

## **NOTICE OF FORFEITURE**

The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(2)(A).

Upon conviction of the offense of conspiracy to commit bank fraud in violation of Title 18, United States Code, Section 1349, Defendant,

**PATRICK STRAUSS,**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation.

### MONEY JUDGMENT

In the event of conviction, the United States may seek a money judgment.

### SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the Defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

_____
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052